IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 21, 2025 Session

**STATE OF TENNESSEE v. RONALD ANDREW ARCHEY**

**Appeal from the Circuit Court for Coffee County**
**No. 16CC1-2022-CR-48017      William A. Lockhart, Judge**

———————————————————

**No. M2024-00755-CCA-R9-CO**

———————————————————

In this interlocutory appeal, the State asks us to review the trial court's pretrial suppression of data from the Defendant's cell phone. Before searching the cell phone, law enforcement officers sought and obtained a search warrant, which a magistrate authorized based upon its finding that probable cause existed to support the search warrant. The Defendant filed a motion to suppress the evidence found on the phone, and the trial court granted the motion. The State asked for, and the trial court granted, an interlocutory appeal to review the trial court's ruling on the motion. After review, we reverse the trial court's order granting the Defendant's motion to suppress.

**Tenn. R. App. P. 9 Interlocutory Appeal as of Right; Judgment of the Circuit Court Reversed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; and C. Craig Northcott, District Attorney General, for the appellant, State of Tennessee.

Andrew Justice, Murfreesboro, Tennessee, for the appellee, Ronald Andrew Archey.

**OPINION**
**I. Facts**

This case arises from the killing of Logan Tindale and Chasity Hill, both of whom were shot to death on September 18, 2021. In March 2022, the Coffee County grand jury indicted the Defendant and co-defendant Blake Hickerson for two counts of first degree murder, two counts of felony murder, one count of especially aggravated burglary, one count of employment of a firearm during the commission or attempted commission of a

dangerous felony, one count of possession of a firearm by a convicted felon, and one count of tampering with evidence.

On September 21, 2021, two days after the murder, law enforcement sought a search warrant to search the Defendant's cell phone. Investigator Brandon Reed, a criminal investigator with the Coffee County Sheriff's Department, submitted an affidavit in support of the search warrant that read as follows:

On September 19th, 2021, Coffee County Sheriff's deputies responded to [an address in] Coffee County, TN, to a call of two people being shot. When deputies arrived, they discovered the victims, Logan Tindale, and Chasity Hill. Both victims were deceased when the deputies arrived. When investigators arrived, it appeared that the victims suffered from gunshot wounds.

During the course of the investigation, we learned of a suspect [the Defendant] . . . through Ms. Kensey Nichole Smotherman. Ms. Smotherman advised [that the Defendant] came to her residence on September 18th, 2021 and when she noticed him, he was standing at her bedroom doorway. Ms. Smotherman advised she [was] unsure of when or how he got in the residence. Ms. Smotherman advised he asked her several questions about her where abouts along with Logan Tindale and Chasity Hill nights before. Ms. Smotherman advised not long after [the Defendant] told her to come outside and put her hands over her ears. Ms. Smotherman advised [the Defendant] escorted her to a tree out front of the residence and he went inside and she heard approx. 6 gunshots. Ms. Smotherman advised that [the Defendant] came back out and le[d] her back into her bedroom when she heard Ms. Chasity Hill say "don't kill me" and she then heard another shot. Ms. Smotherman advised [the Defendant] told her not to come out of her bedroom and he left. During [the Defendant] being there he had mentioned "two brothers being in the room with Mr. Tindale and Ms. Hill". Ms. Smotherman advised she didn't come out of the bedroom until the next morning (daylight) when she went straight to Ms. Saundra Perry's residence and told her about it. Ms. Perry went to the residence [where the shooting occurred] and located Mr. Tindale and Ms. Hill deceased. Ms. Perry then notified Police.

On this same date, Investigator Gullett and myself spoke with Ms. Lisa Partin [the Defendant's girlfriend] down the road from the crime scene. We asked Partin about [the Defendant's] where abouts and she advised she

2

hadn't talked with him since the night before when he got mad at [a neighbor's residence] and walked away from the residence. Ms. Partin advised me I could look through her phone. Upon looking through her call log I noticed that she had spoke[n] with [the Defendant] on several occasions on 09/18/21 through 09/19/2021. Ms. Partin had previously advised that [the Defendant] had broke[n] his phone the night he got mad at [the neighbor's] residence.

Later in the evening on September 19th, 2021, [the Defendant] got into contact with Deputy Kelly Smith (SRO Coffee County Sheriff's Department) and was inquiring [about] what was going on and said he heard Investigators needed to speak with him. Deputy Smith advised him we needed to clarify some stuff with him. [The Defendant] advised Deputy Smith where he was and advised him to tell [Investigators] to come talk to him. [The Defendant] advised Deputy Smith he was at his residence [in Hillsboro, Tennessee].

Investigator Brandon Gullett, Investigator John Anthony, Investigator Blake Simmons, Investigator Jason Maloney and myself went to the residence to make contact with [the Defendant]. We had already learned that [the Defendant] was living in an outbuilding/shed on the back of the property at [a house on] . . . A Street. I first attempted to make contact at the front door [of the house] with no contact. We then went to the back yard where the outbuilding/shed was when [the Defendant] came from the back of the property through what appeared to be the B Street area. [The Defendant] did advise while we were there and pointed out which outbuilding/shed he was living in. [The Defendant] agreed to come to the Sheriff's Department and speak with us about this matter. While in route [the Defendant] was mirandized (all recorded) and some questions w[ere] asked while in route.

Upon arrival at the Sheriff's Department [the Defendant] was again asked about the incident and he denied even being on the property with Investigator Gullett and myself in the room. Sheriff Chad Partin then came in and Investigator Gullett left and [the Defendant] still denied being at the residence [where the shooting occurred]. Sheriff Partin and myself walked out for approx. 20 minutes and went back in. Upon going back in [the Defendant] advised us that he indeed did go to the property but was victim of kidnap. [The Defendant] advised he was forced to go there by 2 unknown masked men in a small black or blue car on B Street in Hillsboro, Tn. [The Defendant] advised they told him he was going in the residence and he went to Ms. Smotherman's bedroom while the two unknown men were in the

3

hallway. [The Defendant] advised he was finally able to get Ms. Smotherman to the front door but she wouldn't leave. [The Defendant] advised he heard and saw gunshots inside the residence but still couldn't get Ms. Smotherman to leave. [The Defendant] advised after the incident he left [the scene of the shooting] and walked to his outbuilding/shed [on] A Street. At one point I asked [the Defendant] about his jacket he had on and he advised the jacket he was wearing the night of the incident was in his outbuilding/shed and that it was a zip up jacket with a hood dark blue in color. While speaking with [the Defendant] he gave me consent to look in his phone. [The Defendant] had made several phone calls on Facebook Messenger after [when he said] the incident happened. [The Defendant] at this point advised he didn't want to answer anything else until his attorney arrived.

On September 20th, 2021, Investigator Gullet and Investigator James Sherrill went . . . and spoke with Ms. Lisa Partin [the Defendant's girlfriend] again. While speaking with Ms. Partin she advised Investigators that [the Defendant] told her that [victim] Tindale was in his vehicle when he arrived and he took him back inside. [The Defendant] then told her that [victim] Chasity [Hill] begged him not to shoot her and she (Hill) gave him no choice. [The Defendant] told Ms. Partin that he took care of business. Ms. Partin advised the shotgun in question was a brown sawed off shotgun which she saw prior to [the Defendant] going to [the scene of the shooting]. Ms. Partin advised the shotgun would be in a tote or in the truck around back which she saw [the Defendant] carrying away from the outbuilding/shed towards the C10 truck.

The affiant, Officer Reed, then stated that "through [his] training and experience [he knew] that" people kept "information stored on their phones such as text messages about evidence, videos, photos/images of the evidence, call logs to and from people involved, locations and other important evidence . . . ." He asserted that the Defendant's phone "possibly has important information (data) relating to the crime of First Degree Murder."

The magistrate agreed and issued a search warrant for the Defendant's phone for evidence pertaining to the crime(s) of first degree murder and other related offenses. It allowed the phone to be subject to a complete forensic examination.

When examining the phone, law enforcement officers found phone calls and text messages between the Defendant's phone and the alleged getaway driver, Lexie Anderson,

who the State believed was using co-defendant Hickerson's cell phone to communicate with the Defendant.

On November 8, 2023, the Defendant filed a motion to suppress the data gathered from his cell phone. In the motion, he acknowledged that he was "likely present [at the crime scene] in some capacity" but said that there was conflicting evidence about whether he shot either victim. He contended that the affidavit did not establish probable cause because it made "little or no effort to show any probable cause that damning evidence would be found in the phone." He asserted that the search warrant was defective for lack of probable cause because the affidavit never tied the crime to the cell phone. He asserted that because there was no nexus between the crime and the cell phone, the Fourth Amendment required suppression of the evidence gleaned from the search.

At a hearing on the motion, the Defendant's counsel ("Counsel") argued that the evidence from the cell phone should be suppressed because "there [was] just an utter lack of probable cause in the search warrant affidavit . . . ." Counsel agreed that the Defendant's girlfriend, Ms. Partin, and Ms. Smotherman provided probable cause that the Defendant committed the crimes but he argued that there was no nexus in the affidavit that supported the search of the phone.

The State informed the trial court that some of the messages at issue were also available to the State because the State had received copies from a third party. From the Defendant's phone, the State sought to introduce the phone call log and three relevant texts. The State recounted the standard of review, which required the trial court to give the magistrate's determination great deference. The State noted that the affidavit included that a witness, Ms. Smotherman, placed the Defendant at the scene of the shooting on the day of the shooting and around the time of the shooting and that cell phones have the ability to track location, meaning the cell phone data could confirm the witness's account. Further, Ms. Smotherman indicated that the Defendant said there were two other brothers in the room with the victims. The cell phone data would show whether there was communication between those brothers and the Defendant around the time of the murder. The State also noted that the affidavit indicated that the affiant had spoken with the Defendant's girlfriend, Ms. Partin, who showed him her phone and indicated that she had spoken with the Defendant around the time of the murders. Ms. Partin was also the mother of one of the victims.

The State noted that the affidavit indicated that the Defendant used his cell phone to call law enforcement to come in for questioning. He then spoke with officers and told them that he was not at the scene of the shooting. This made location tracking important, as indicated in the affidavit. The State said the trial court was within its discretion when it

5

used a commonsense inference that the Defendant may have had his cell phone with him at the time of the offense and that the cell phone data would show whether he was at the location of the shooting.

The trial court then stated:

The issue that I'm running into is getting into the reasonableness of that inference because if you take that to its fullest extent you can search anyone's cell phone at any time that is involved in any crime if you can establish probable cause that they are involved in whatever crime.

The trial court expressed concern that this was too broad an implication. The State said that case law required that the trial court make a reasonable inference as to whether there would be useful information on the cell phone to be searched. The State also noted that the Defendant granted law enforcement consent to look at his phone, which showed he had made several calls on Facebook Messenger shortly after the shooting.

The State also argued that the evidence should not be suppressed because law enforcement officers relied upon it in good faith. Had it been denied, the officers could have presented additional evidence to bolster the necessity of the search warrant. It further noted that, if the trial court granted the motion to suppress, the State could also then file a second affidavit to search the cell phone, which was still in its possession, based upon the other evidence gathered during the investigation.

After further argument, the State asked to make an offer of proof regarding what it found on the cell phone that it would seek to introduce at trial. The trial court took that request under advisement, but the court ultimately did not allow the State to make an offer of proof.

On February 29, 2024, the trial court issued a written order granting the Defendant's motion to suppress. The order stated:

[T]he Defendant argues that the search warrant lacked probable cause inasmuch as there was not a reasonable nexus to the crime being investigated and the Defendant[']s cell phone. After a review of the warrant, pleadings and argument of counsel the Motion is GRANTED for the reasons outlined below.

The warrant in question was obtained by Inv. Brandon Reed on September 21, 2021. It was introduced as an exhibit to the hearing. The

warrant lays out thoroughly the probable cause that Defendant was at the residence when the killings occurred. This is based in large part . . . on his admission to being there during an interrogation.

However, the warrant itself is for the electronic cellular telephone data of the Defendant. In the affidavit the only reference to a cell phone is to communications with Lisa Partin, the Defendant['s] girlfriend, and that he had used Facebook Messenger to make some calls in the days following the killings. These assertions alone do not show a nexus between the crime and the place to be searched, here the phone, as is required.

The State argues essentially if you are suspected of a crime and own a cell phone, that the reasonable inference is that you would carry that cell phone with you during the crime and it would likely have evidence of a crime or communication of the crime following the crime. The Court believes that is not a reasonable inference and that the Fourth Amendment requires more specific and articulable facts of why information pertaining to the crime would be on the phone.

On April 1, 2024, the State sought an interlocutory appeal to the trial court. The trial court granted the motion and certified the following issue for interlocutory appeal:

Whether the trial court erred by suppressing all data from the [D]efendant's cell phone after finding that the search warrant affidavit failed to establish probable cause.

This court considered all of the criteria expressed in Rule 9 of the Tennessee Rules of Appellate Procedure, which provides for interlocutory appeals, and agreed with the trial court that the State's application should be granted.

## II. Analysis

On appeal, the State asserts that the trial court erred when it granted the Defendant's motion to suppress because the affidavit provided probable cause. Further, even if not, the law enforcement officers reasonably relied upon the magistrate's determination that probable cause existed. The Defendant contends that the trial court correctly ruled that his motion to suppress should be granted because there was no probable cause to support the warrant.

In reviewing a motion to suppress, this Court is bound by the trial court's findings of fact unless the evidence preponderates against them. *State v. Saine*, 297 S.W.3d 199, 205 (Tenn. 2009); *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). We are mindful that "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party in the trial court is afforded "the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* While we defer to the trial court's findings of fact, the application of the law to those facts is a question of law, which this Court reviews *de novo* with no presumption of correctness. *Saine*, 297 S.W.3d at 205 (citing *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). We also review the trial court's conclusions of law *de novo*. *Id.* (citing *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005)).

Both the federal and state constitutions protect against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution similarly guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." These constitutional provisions are "identical in intent and purpose." *State v. Hamm*, 589 S.W.3d 765, 771 (Tenn. 2019). "[U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005).

In this case, law enforcement sought, and a magistrate granted, a search warrant. The Defendant contends that the search warrant for his residence was unsupported by probable cause because it failed to establish a sufficient nexus between his cell phone and the murder. Generally, courts will presume that a search was reasonable if it was conducted pursuant to a valid warrant. *State v. McElrath*, 569 S.W.3d 565, 570 (Tenn. 2019). A sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an "indispensable prerequisite" to the issuance of a search warrant. *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). The affidavit must present facts from which a "'neutral and detached magistrate, reading the affidavit in a common sense and practical manner'" may determine the existence of probable cause for issuance of the search warrant. *Carter*, 160 S.W.3d at 533 (quoting *Henning*, 975 S.W.2d at 294). "To ensure that the magistrate exercises independent judgment, the affidavit must contain more than mere conclusory allegations by the affiant." *Henning*, 975 S.W.2d at 294. The

8

probable cause determination of a neutral and detached magistrate is "entitled to 'great deference' by a reviewing court." *State v. Jacumin*, 778 S.W.2d 430, 431-32 (Tenn. 1989).

To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized. *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002); *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993). In determining whether the nexus has been sufficiently established, we "consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct [,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence." *Reid*, 91 S.W.3d at 275; *see also Smith*, 868 S.W.2d at 572. Our supreme court has upheld a magistrate's determination where the magistrate "could reasonably infer" that evidence was in the location for which the search warrant was sought. *Saine*, 297 S.W.3d at 206.

In determining whether probable cause supports the issuance of a search warrant, reviewing courts may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant. *Carter*, 160 S.W.3d at 533. The affidavit in this case did not contain direct information connecting the object of the search, the cell phone, with the murder. The affidavit did not state, for example, that there would likely be pictures of the victims contained on the phone. We must therefore determine whether it was reasonable for the magistrate to infer that information connecting the Defendant to the location of the murders and communications with others involved in the murders would be located on the Defendant's cell phone.

"Articulating precisely what probable cause means is not possible. Probable cause is more than a mere suspicion but less than absolute certainty. [T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." *Id.* at 299-300 (internal citations and quotation marks omitted). When an affidavit is proffered to show probable cause for a search warrant, "it must 'set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched.'" *State v. Tuttle*, 515 S.W.3d 282, 300 (Tenn. 2017) (quoting *State v. Smith*, 868 S.W.2d 561, 562 (Tenn. 1993)). Thus, to prove probable cause exists, "the affidavit presented to the magistrate must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Id.*

Giving deference to the magistrate, we conclude that it did not err when it determined that the affidavit provided probable cause to support the search warrant. The affidavit provided a sufficient nexus between the murders and a search of the cell phone. The affidavit included the statement of a witness, Ms. Smotherman, who said that the

Defendant was at the scene of the murders when they occurred. The Defendant asked Ms. Smotherman about where she, victim Tindale and victim Hill had been in the nights before the shooting. He then walked the victim outside, told her to put her hands over her ears, went back into the residence, and Ms. Smotherman heard six gunshots. The Defendant escorted Ms. Smotherman back inside the house where she heard Ms. Hill say, "don't kill me." She then heard another gunshot. The Defendant told Ms. Smotherman that there were "two brothers" in the room with the victims.

The affidavit also included statements from the Defendant's girlfriend, Ms. Partin. Ms. Partin offered her phone to law enforcement officers who saw that the Defendant had communicated with Ms. Partin by phone on several occasions on the day of the murder before it occurred and the day after the murder. In a subsequent interview, Ms. Partin said that the Defendant admitted shooting Ms. Hill. He also told her that Mr. Tindale was in his vehicle when the Defendant arrived, and the Defendant took Mr. Tindale inside. Ms. Partin said that she had seen the Defendant with a sawed-off shotgun.

The affidavit also detailed how the Defendant contacted investigators two days after the shooting, using his cell phone. The Defendant spoke with two different sets of investigators and twice denied being present at the shooting scene. He later changed his story and said that he was present when the gunshots were fired but that he had been kidnapped by two unknown masked men and taken to the residence. At first, the Defendant gave officers consent to look at his phone, which showed that he had made several phone calls using Facebook Messenger after the killings occurred.

The affidavit specifically said that affiant Investigator Reed, through training and experience, knew that there could be valuable information stored on cell phones, including evidence of text messages and evidence about locations. The affiant posited that the cell phone belonging to the Defendant possibly had important data on it.

Applying the standard that the probable cause determination of a neutral and detached magistrate is "entitled to 'great deference' by a reviewing court," *see Jacumin*, 778 S.W.2d at 431-32, we conclude that the facts contained in the application for the search warrant established a substantial basis on which the magistrate could conclude that evidence of the Defendant's "location" i.e. his presence and involvement in the murder would be found on his phone. *See id.* The Defendant's location at the scene of the murder was clearly at issue. Ms. Smotherman placed him there, the Defendant at first denied being present, but he later said he was present as a kidnapping victim. The Defendant offered officers his phone, which showed he used it before and after the murders. Ms. Partin showed that the Defendant had communicated with her by phone before and after the murder. The magistrate did not err when it determined that the evidence in the affidavit

was sufficient to demonstrate a nexus between the Defendant's location information which could be found on his cell phone and his involvement in the crimes.

Further, the magistrate did not err when it reasonably inferred that there existed probable cause based upon the sufficient nexus between the murders and the Defendant's phone, sufficient to establish probable cause, based upon the Defendant's cell phone usage. The affidavit states that the Defendant communicated with Ms. Partin via that phone before and after the murder. It is reasonable to assume he had his phone with him between those communications and during the murders. The affidavit also states that the murders were committed by multiple people, one of whom was the Defendant, and it is reasonable to assume that they communicated via cell phone around the time of the murders.

We acknowledge the trial court's concern that giving law enforcement over-broad access to potential suspect's cell phone data may implicate constitutional protections. We, however, do not think that the magistrate's decision in this case lacked probable cause. Accordingly, we hold that the search warrant for the Defendant's phone was supported by probable cause, and we reverse the trial court's suppression of the evidence obtained during that search.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, the trial court's ruling is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____s/ *ROBERT W. WEDEMEYER*__
ROBERT W. WEDEMEYER, JUDGE